**United States District Court**
**District of Massachusetts**

```
                                )
JAMES DICKEY,                   )
          Plaintiff,            )
                                )
          v.                    )    Civil Action No.
                                )    07-11717-NMG
EDWARD KENNEDY,                 )
          Defendant.            )
                                )
```

**MEMORANDUM & ORDER**

**GORTON, J.**

Pro se plaintiff James Dickey ("Dickey") brought suit

against Edward Kennedy ("Kennedy") for 1) violation of the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

U.S.C. § 1962(c), based upon extortion, attempted extortion and

mail fraud and 2) conspiracy to do the same in violation of 18

U.S.C. § 1962(d). Before the Court is Kennedy's motion for

summary judgment.

## I.   Factual Background

Plaintiff claims that Kennedy and others engaged in an

unlawful scheme to "extort" real property from Boston property

owners, one of whom is Dickey. The summary judgment record is

expansive and these facts have been gleaned from the parties'

lengthy submissions. Kennedy was an employee of the City of

Boston's Inspectional Services Department ("ISD"). John Meaney

("Meaney") is a Health Inspector for ISD who also served as a

Hearing Officer during condemnation hearings.  Jonathan Kaye ("Kaye") is the third prominent actor in the alleged enterprise but his status is not clear.  Dickey claims that Kaye is a contractor from Rhode Island but Kennedy does not confirm that.

ISD is authorized to enforce the Massachusetts sanitary code governing the condition of buildings and their fitness for human habitation.  See M.G.L. c. 111, § 127A; 105 C.M.R. 400.100.  That authority includes the ability to order buildings deemed unfit for habitation to be vacated, put in a clean condition or placed in compliance with regulations.  M.G.L. c. 111, § 127B.  A court must appoint a receiver to bring a property into compliance with the sanitary code whenever 1) a petitioner demonstrates that violations will not be promptly remedied unless a receiver is appointed and 2) the court determines that such appointment is in the best interest of occupants.  § 127I.[1]

Dickey contends that Kennedy exploited that process with respect to his and other properties in a scheme which generally proceeded as follows.  Kennedy, in his official capacity, would condemn a building with the intention of forcing its owner to sell it to his associates at a low price.  Meaney, acting as the ISD Hearing Officer, would then ensure that the condemnation was

---

[1]  Dickey challenged part of that process as unconstitutional but was unsuccessful.  Dickey v. Inspectional Servs. Dep't of the City of Boston, No. 08-cv-11569 (PBS), 2009 WL 2425957 (D. Mass. July 31, 2009) (upheld on appeal).

upheld.  If the owner did not sell, Kennedy would allegedly

> 'feed' the building to an associate [i.e., Kaye or
> Meaney] for the purpose of extorting the building by
> purchasing [it] at a reduced rate.

In one instance, Dickey claims, that meant that Meaney was simply

able to purchase a building for a low price and turn a quick

profit.  In other instances, it meant that Kennedy would have

Kaye appointed as receiver for the building.  Kaye would then

allegedly record an excessive mortgage on the property and later

foreclose once repairs were done.  According to Dickey, the

amount of the mortgage would, in effect, become the (reduced)

purchase price because Kaye would submit exaggerated expenses for

rehabilitating the property.

In support of his claim that such activity represented a

pattern of racketeering activity, Dickey provides five examples

of alleged predicate acts.[2]  Dickey also includes various

allegations with respect to properties at 18 Jerome Street in

Dorchester, Massachusetts and 534-544 Dorchester Avenue in South

Boston, Massachusetts.  He does not, however, claim that any

allegedly improper conduct regarding those two properties

constituted predicate acts to his causes of action.  Because it

is therefore unclear what purpose the allegations serve apart

---

[2] Although this Court's September, 2008 ruling barred all
claims based upon injury occurring prior to September 14, 2003,
all of Dickey's alleged violations are included here as
background.

from attempting to paint the defendant in a negative light, they are not repeated. The five alleged predicate acts are:

1) <u>199-201 Athens Street, South Boston</u>.[3] This property is currently owned by Marian Sklodowski ("Sklodowski") and formerly belonged to Jadwiga Rochalska ("Rochalska"). In August, 2000, ISD condemned the property as unfit for habitation citing, <u>inter alia</u>, its dilapidated condition, the frequent presence of homeless people and occasional fires. At some point that fall, Dickey claims that Kennedy presented a written offer to purchase the building which was declined. Dickey has submitted only an affidavit from Sklodowski and not the alleged offer.

In April, 2001, Kennedy reinspected the property. He found that violations still existed and thus ordered it to be forwarded for receivership. A motion for receivership was filed in January, 2002 detailing numerous violations. The City made several unsuccessful attempts to serve then-owner Rochalska personally but claimed that it could not locate her. Dickey alleges that Kennedy knew Rochalska's address as early as October, 2000 but withheld it from the City's attorney in order to ensure that a receiver was appointed pursuant to his scheme. In support of that proposition, he submits a letter addressed to Kennedy noting the change in address as well as a return receipt

---

[3] This property was at issue in <u>City of Boston</u> v. <u>Rochalska</u>, 890 N.E.2d 157 (Mass. App. Ct. 2008).

-4-

indicating that the letter was delivered to ISD.

In any event, without a response from Rochalska, the motion to appoint a receiver was allowed in March, 2002 and Kaye was appointed.  That must have put Rochalska on notice because she filed a motion to stay the receivership shortly thereafter seeking to complete the rehabilitation herself.  The Court allowed her motion but Kaye retained the limited authority to take all steps necessary to enable the Fire Department to enter the premises.  In December, 2002, Kaye's receivership was dissolved and Sklodowski, who had been allowed to intervene, was ordered responsible for the building's rehabilitation.

What Kaye was due for his nine months as receiver remained to be determined by the Housing Court.  Kennedy was a witness during that process and Dickey contends that Kaye exaggerated his expenses.  Most of the claims he makes here were, however, considered by the Housing Court and several were discredited. That said, the Housing Court expressed some skepticism towards Kaye's submissions and noted troublesome testimony regarding certain fees.  Ultimately, the Housing Court awarded about $124,000 in expenses which was less than what Kaye had requested. The Massachusetts Appeals Court then vacated the Housing Court's award and remanded the case with respect to one charge ($20,000 in security services) because it was unsupported.  The Appeals Court also expressed a general skepticism towards Kaye's

-5-

accounting.  Rochalska, 890 N.E.2d at 167 n.18.

According to Dickey, the resolution in that case had two consequences: it exposed the enterprise's activities but it also emboldened the enterprise because it had "withstood [its] first legal challenge, basically unscathed".

2) 724 East Second Street, South Boston. This property belongs to the plaintiff. Dickey contends that, in March, 2003, Kennedy informed him that he had noticed that someone was living in the second floor apartment of Dickey's house. Kennedy told Dickey that if he did not remove the occupant from the apartment, he would board up the house. Dickey asked the occupant to vacate the apartment and he complied forthwith. Also at that time, Kennedy allegedly asked Dickey if he was interested in selling the property but Dickey demurred.

After an inspection on March 4, 2003, Kennedy issued a notice of possible condemnation. A hearing was held (at which Meaney was not the Hearing Officer) and sufficient cause was found to hold the property unfit for habitation. Violations included exposed electrical boxes, improper smoke detectors and a rotting porch. Dickey asserts, however, that "the hearing officer never had the building seized". Dickey also claims that the condemnation was "an attempt to force a sale" but that assertion appears to be based only upon his speculation in an affidavit.

-6-

3) 27 G Street, South Boston. Dickey alleges that Kennedy condemned this property in June, 2003 for the purpose of having an associate purchase it at a reduced rate. In contrast to his submissions with respect to other properties, however, Dickey provides no document to show even that the building was condemned apart from his own affidavit. In September, 2003, the property was apparently sold to three individuals including Meaney for $260,000. The property was renovated and then resold in March, 2005 for over $600,000.

4) 20 Claybourne Street, Dorchester. In August, 2003, Kennedy condemned this building (not owned by Dickey) as unfit for human habitation because it had been vacant for years and was, for example, overgrown and infested with rodents. A hearing was held the following month at which Kennedy testified and Meaney was the Hearing Officer. After the hearing, Meaney upheld the condemnation but his decision stated that the condemnation could be lifted if the owner submitted plans to renovate the property and acquired permits to do so. There is no indication that the owner attended the hearing or responded.

Kennedy reinspected the property in October, 2003. He found that no work had been done and the building remained abandoned and, therefore, ordered the case moved forward for receivership. That same month, ISD sent a letter to the Massachusetts Attorney General's Office ("the AG's Office" or "the AG") requesting that

-7-

it file a petition for receivership. Although the letter does not indicate as much, Dickey contends that it was sent via U.S. Mail.

In any event, a petition was filed and, in October, 2004, Kaye was appointed as receiver. He then submitted estimates for bringing the property into compliance with the law to the Housing Court. In February, 2005, Kaye executed an Assignment of Receiver's Priority Lien pursuant to which he received a loan of $401,504 from Boston Community Capital to renovate the unoccupied building. In late 2005, after the renovation and ISD's acknowledgment that all violations had been corrected, the Housing Court entered an order authorizing the receiver to foreclose on the lien, which remained unpaid, by public auction. The auction was held on December 12, 2005 and Kaye, in his individual capacity, placed a successful bid to purchase the property for $468,000. In his final report to the Housing Court as receiver, Kaye stated that he had satisfied all liens and costs of foreclosure, repaid Boston Community Capital and reimbursed the receiver for the balance of his lien and other costs associated with the sale. He stated that their were no excess funds to deposit with the Court.

Dickey claims that Kaye again submitted exaggerated expenses because $468,000 is in excess of 1) the estimate on his construction permit ($250,000 in total costs) and 2) his original

-8-

estimates to the Housing Court (ranging from about $330,000 to $386,000). Kaye has apparently refused to provide a breakdown of the $468,000 and has since sold the property for $510,000.

5) 97 Mount Ida Road, Dorchester. Dickey is the owner of this property. He claims that, at an unidentified time, the defendant's brother, John Kennedy, tried to contact him about the property but that he did not respond. On August 25, 2003, perhaps motivated by John's inquiry, Dickey obtained a permit to re-side the building. He had begun that work when, on September 16, 2003, Kennedy condemned the property and had it boarded up. Dickey was charged for the cost of the boarding and Kennedy allegedly threatened Dickey with arrest for trespass if he went near the house.

On October 7, 2003, the City held a condemnation hearing and Meaney was the Hearing Officer. Kennedy testified that, prior to the condemnation, ISD had received a letter from concerned neighbors about the building's unsafe condition. Kennedy found a history of unsafe conditions at the property and discovered that Dickey had a shoddy record of responding to ISD. Kennedy then inspected the building and uncovered numerous violations including a dangerous porch, collapsed rear steps, rodents, large amounts of debris and no working hall lights. As a result, he issued an emergency order to vacate and board up the building. A tenant also testified about the building's poor condition and

-9-

Dickey was offered an opportunity for rebuttal. He did not contest the majority of Kennedy's allegations but stated that he was in the process of re-siding and cleaning out the basement. He also noted that he was trying to get a permit "to pull the house back together" and had had a contractor visit.

Meaney upheld the condemnation in a Notice of Decision that repeated most of the violations reported by Kennedy. The decision also included the statement "[f]ront and rear common halls missing, broken not working (repair/replace)" and noted that condemnation could be lifted if Dickey took certain steps to remedy the problems.

On October 14, 2003, Kennedy reinspected the property. He reported that violations still existed and that no permits had been issued and, therefore, ordered the case to proceed to receivership. Two identical letters were allegedly sent to the AG's Office from ISD by U.S. Mail requesting the filing of a petition to appoint a receiver. The following month, Dickey's contractor secured a building permit for the property and Dickey was notified by the AG's Office that it would not seek the appointment of a receiver if he made the requisite repairs.

Two years later, in August, 2005, the AG sent Dickey a letter indicating that long-standing problems with the building continued to impact neighbors and threatening receivership if he did not fulfill his legal responsibility to fix them. In

-10-

November, 2005, after the Post Office returned its letter as
undeliverable, the AG's Office filed a motion in the Housing
Court to appoint a receiver.  The petition stated that many
violations persisted despite "repeated promises to remedy the
situation" from Dickey.  A hearing was held on December 21, 2005
after which, Dickey claims, the AG's Office decided not to go
forward with the case.

In May, 2006, the AG's Office filed a status report on its
motion to appoint a receiver.  It again indicated that Dickey was
not complying with his promise to come up with a schedule for
renovations and that an ISD inspector (not Kennedy) found
continued violations.  The officer, therefore, requested
appointment of Kaye as receiver.  Dickey claims, in his
affidavit, that the petition was denied after he showed the judge
pictures of the property at a hearing, presumably depicting some
progress with repairs.

## II.  **Procedural History**

Dickey filed his complaint on September 14, 2007 and Kennedy
responded with a motion to dismiss.  In September, 2008, this
Court allowed Kennedy's motion to the extent it sought to dismiss
claims based on injuries that occurred prior to September 14,
2003 but otherwise denied it.  Dickey filed an amended complaint
two months later and the case then proceeded through discovery.
In September, 2009, Kennedy filed a motion for summary judgment

-11-

which Dickey opposed the following month.

## III. **Analysis**

### A.   **Legal Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." Id. A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The Court must view the entire record in the light most hospitable to the non-moving

-12-

party and indulge all reasonable inferences in that party's

favor.  O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).

If, after viewing the record in the non-moving party's favor, the

Court determines that no genuine issue of material fact exists

and the moving party is entitled to judgment as a matter of law,

summary judgment is appropriate.

## B.   Application

Dickey alleges two counts: 1) a civil RICO claim based upon

an alleged violation of 18 U.S.C. § 1962(c) and 2) conspiracy to

do the same in violation of 18 U.S.C. § 1962(d).  Kennedy moves

for summary judgment with respect to both causes of action.

Although Dickey has made out an arguable case of suspicious

activity involving a consistent cast of characters, he has not

established a viable claim under either count.  The Court will,

therefore, enter summary judgment in Kennedy's favor.

### 1.   Civil RICO Claim

RICO's civil enforcement scheme allows "[a]ny person injured

in his business or property by reason of a violation of section

1962" to bring suit.  18 U.S.C. § 1964(c).  A valid claim based

upon a violation of § 1962(c) entails 1) conduct 2) of an

enterprise 3) through a pattern 4) of racketeering activity.

E.g., Kenda Corp. v. Pot O'Gold Money Leagues, Inc., 329 F.3d

216, 233 (1st Cir. 2003) (citation and quotation marks omitted).

A "pattern" requires at least two predicate acts of racketeering

activity, id., and racketeering activity, in turn, covers a wide range of unlawful conduct including extortion and mail fraud. 18 U.S.C. § 1961(1).

Kennedy argues that summary judgment is warranted because there is no evidence of either an enterprise or any racketeering activity. Dickey's opposition attempts to state his case with respect to each of the four elements. The Court need only consider whether there was any "racketeering activity". In that regard, Dickey claims liability based upon 1) extortion and attempted extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, and 2) mail fraud in violation of 18 U.S.C. § 1341. Each is considered in turn.

### a. Extortion and Attempted Extortion

RICO includes any act indictable under the Hobbs Act, 18 U.S.C. § 1951, as a "racketeering activity". 18 U.S.C. § 1961(1)(B). The Hobbs Act, in turn, defines extortion as

the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. § 1951(b)(2). With respect to public officials, the statute mirrors the common law and "merely requires of the public official that he obtain 'property from another, with his consent, ... under color of official right.'" Evans v. United States, 504 U.S. 255, 263-65 (1992). Extortion therefore requires that the victim consent to give up his property and yield to an official's

-14-

authority.  E.g., Unites States v. Brock, 501 F.3d 762, 770 (6th
Cir. 2007) ("[A]ll victims of extortion must consent to give the
money to the public official."); United States v. Zhou, 428 F.3d
361, 370-72 (2d Cir. 2005).  See also Camelio v. Am. Fed'n, 137
F.3d 666, 670-71 & n.5 (1st Cir. 1998) (explaining that injuries
caused only by defendants' unilateral acts did not occur with
plaintiff's consent and thus did not constitute extortion in
violation of the Hobbs Act).

Here, Kennedy contends that there is no evidence that he
extorted Dickey's property.  In particular, he argues that to
"obtain" property under the Hobbs Act requires an actual transfer
of property from the plaintiff to the defendant.  Because Dickey
has no evidence that Kennedy monetarily benefitted from the
alleged enterprise (a fact Dickey admits), Kennedy maintains that
he cannot be held liable for extortion.

Dickey responds that RICO does not require successful
extortion but only that the defendant's actions cause damage to
the plaintiff.  Such damage here, he contends, is his loss of
rental income and other incurred costs.  He then restates the
general scheme that he labels extortion of real property: 1)
Kennedy would condemn a building with the intention of forcing
the owner to sell for a reduced rate, 2) if the owner refused,
Kennedy would have the building placed into receivership, 3) an
associate would be appointed receiver and 4) the receiver would

-15-

then place an excessive mortgage on the property and later
foreclose on it, effectively purchasing the property for a low
price.

The trouble with Dickey's argument is that what he alleges
is not extortion or attempted extortion under the Hobbs Act. In
particular, nothing in his claims or pleadings establishes any
consent on the part of the alleged victims. See 18 U.S.C. §
1951(b)(2) (defining extortion as the obtaining of property from
another "with his consent"). Instead, Dickey repeatedly seeks to
show that Kennedy and his crew unilaterally condemned, renovated
and then sold property (or attempted to do the same) against the
will of or unbeknownst to the "victims". Even crediting Dickey's
theory that Kennedy sought to obtain property for low prices
under color of official right (a dubious proposition for reasons
stated below), neither Dickey nor any other property owner gave
in to such demands or consented to giving up his property.
Dickey cannot, therefore, establish a claim for extortion under
the Hobbs Act.

To be sure, that is not the only problem with Dickey's claim
and his allegations rest on a shaky factual foundation built upon
frequent speculation. In his filings, for example, he neglects
the fact that ISD acted in the face of obvious sanitary
violations and that receivers were only sought after property
owners proved delinquent or non-responsive, as the Massachusetts

-16-

statute allows.  Moreover, Kaye was only appointed receiver in two of the five allegedly predicate acts (and is only mentioned with respect to three) and Meaney was not always the Hearing Officer.  Furthermore, Dickey acknowledges that the "scheme" never succeeded against him and that he has no evidence that Kennedy monetarily benefitted from any alleged wrongdoing.  Cf. Wilkie v. Robbins, 551 U.S. 537 (2007) (extortion under color of official right does not include taking property for the sole benefit of the government even if the official arguably stretches his authority).

Fortunately, however, the Court need not delve too deeply into the allegations and voluminous documents submitted.  The fact that Dickey cannot make out a claim for extortion under the Hobbs Act is dispositive and, accordingly, the Court will allow Kennedy's motion for summary judgment to the extent that it is based thereupon.

### b.  Mail Fraud

A violation of the mail fraud statute may also serve as the basis for a RICO claim.  18 U.S.C. § 1961(1)(B).  That statute requires proof of 1) a scheme to defraud based on false or fraudulent pretenses, representations or promises, 2) the defendant's knowing and willing participation in the scheme with the intent to defraud and 3) the use of interstate mail communications in furtherance of that scheme.  18 U.S.C. § 1341;

-17-

<u>United States</u> v. <u>Hebshie</u>, 549 F.3d 30, 35 (1st Cir. 2008)

(citation omitted). The alleged falsehood must also be material.

<u>Neder</u> v. <u>United States</u>, 527 U.S. 1, 25 (1999).

The third element has been construed broadly. It requires

that the defendant both cause the use of the mails (which

includes reasonably foreseeable mailings) and use the mails for

the purpose, or in furtherance, of executing the scheme to

defraud. <u>Hebshie</u>, 549 F.3d at 36. For a mailing to be in

furtherance of or for the purpose of executing the scheme, it

need only be incident to an essential part of the scheme or a

step in the plot. <u>Schmuck</u> v. <u>United States</u>, 489 U.S. 705, 710-11

(1989) (citation and quotation marks omitted). Mailings may be

innocent or routine and the "relevant question at all times is

whether the mailing is part of the execution of the scheme as

conceived by the perpetrator at the time". <u>Id.</u> at 714-15. Use

of the mail, moreover, need not have been originally intended if

it was a reasonably foreseeable means of executing the plan.

Kennedy contends that Dickey cannot demonstrate any mail

fraud because there is no evidence that anyone 1) authored false

documents with the intent to defraud or 2) used the United States

mails in furtherance of any purported scheme. With respect to

the latter point, Kennedy argues that Dickey has no personal

knowledge about mail correspondence from ISD to the AG.

Dickey disputes Kennedy's factual allegations and responds

-18-

that Kennedy and his "associates" committed mail fraud "by mailing false information to the Attorney General's Office for the purpose of extorting property". The only allegations regarding mail fraud pertain to two properties, 20 Claybourne Street and 97 Mount Ida Road, and Dickey specifically identifies only three allegedly fraudulent letters. He focuses on two, both of which were allegedly mailed from ISD to the AG's Office requesting the appointment of a receiver. In particular, he cites the statement in an attached decision regarding 97 Mount Ida Road that "[f]ront and rear common halls missing, broken not working (repair/replace)" and contends that it was fraudulent and false. The third letter is an August, 2005 mailing from the AG's Office to Dickey about his property at 97 Mount Ida Road. Dickey claims that the letter was sent at Kennedy's direction and stated that the building continued to deteriorate and was open and exposed to the elements.

    The Court will allow summary judgment with respect to Dickey's mail fraud claims because the three alleged mailings are too thin a reed on which to hang liability. First, Dickey has not identified any intentional material falsehood. With respect to the two letters sent to the AG's Office, the only statement specified as a misrepresentation is the nonsensical assertion "[f]ront and rear common halls missing, broken not working (repair/replace)". Dickey spills considerable ink over this

phrase and its apparent falsity.  Because it is difficult to

imagine how hallways could go missing, however, it is likely a

typographical error meant to indicate (as did testimony at the

hearing) that lights or doors in the halls were missing or

broken.

Moreover, even if the statement was deliberately false, it

was one among many regarding the poor condition of Dickey's home

prior to condemnation.  No reasonable juror could find that it

was a material falsehood capable of influencing the intended

victim (presumably Dickey) or anyone else.  See Neder, 527 U.S.

at 22 n.5 & 24.  With respect to the August, 2005 letter, there

is no indication that statements about the building's condition

were false at the time they were made.  Dickey has submitted

undated photographs of the building and claims only that, as of

December, 2005, the building was not boarded up.  No reasonable

juror could therefore find that the letter contained a material

falsehood capable of supporting a mail fraud claim.

Nor is the Court convinced that the specified letters were

mailings caused by Kennedy or made for the purpose of executing

his alleged scheme to defraud.  To be sure, these elements have

been interpreted broadly.  The evidence that Dickey sets forth

is, however, fatally sparse even assuming (despite the lack of

concrete evidence) that all of the letters were sent via U.S.

Mail.  With respect to causation, he seeks to infer that Kennedy

"caused" two of the three mailings to be made simply because his purported girlfriend allegedly drafted the letters. That is a significant inferential leap. The August, 2005 letter has no direct connection to Kennedy beyond Dickey's speculation. Moreover, unlike frauds involving false insurance claims, for instance, it is not at all clear why any use of the mail would have been a reasonably foreseeable part of the scheme that Dickey describes.

To build his claim, as he did for extortion allegations, Dickey piles inference upon inference. The Court is unpersuaded and finds that the specified letters are an insufficient basis from which to extrapolate a violation of RICO for mail fraud. Kennedy's motion for summary judgment will, therefore, be allowed.

### 2.  Conspiracy Claim

Dickey's conspiracy claim pursuant to 18 U.S.C. § 1962(d) is identical to his affirmative claim under § 1962(c). Because he cannot make out a substantive RICO claim, Count II based upon an alleged conspiracy to commit the same violations also fails. E.g., Efron v. Embassy Suites (Puerto Rico), Inc., 223 F.3d 12, 21 (1st Cir. 2000); Miranda v. Ponce Fed. Bank, 948 F.2d 41, 45 n.4 (1st Cir. 1991).

**ORDER**

In accordance with the foregoing, defendant's motion for summary judgment (Docket No. 25) is **ALLOWED.**

**So ordered.**

Nathaniel M. Gorton
United States District Judge

Dated June 25, 2010

-22-